We'll call the next case. Jackson, Robert Jackson v. Carl Denberg. Mr. Wiseman. Good morning, Your Honor. May I reserve three minutes for my rebuttal, please? That request will be granted. Thank you, Your Honor. Good morning. May it please the Court. My name is Michael Wiseman, and I, along with Maria Polsetti and Helen Marino, represent the certified class, as well as Mr. Jackson. This case is before the Court on the District Court's grant of summary judgment, based on an assumption that Delaware's adoption of an execution protocol that is substantially similar to that approved of in Bayes, i.e., the Kentucky Protocol, resolves. Just one question. I look at these briefs, and maybe I've seen it before, but how did your office get this case for Delaware? Oh, that might be more time than I have to explain. I won't count it against you. Okay, very good. Then I'll answer. We were asked by the Administrative Office of the United States Courts to get involved in Delaware. We did so about three years ago. I'm happy to report that the Delaware Federal Defender has recently opened a CHU, the Capital Habeas Unit, such as my office. In fact, Ms. Brain is the head of that office, and she's sitting in the back, checking out the Court, as well as this argument. That's satisfactory. Thank you. You mentioned Bayes. Does Bayes merely stand for the proposition that Kentucky's protocol is constitutional, or does it set a substantial risk standard, and how does it do that with only three justices? Well, it clearly, the plurality opinion says that a protocol that is like Kentucky's does not, in writing, establish a substantial risk of causing serious harm. Our view, and we think it's rather clear in Bayes, is that it says nothing about the implementation of the protocol. We believe that we have established through discovery. You feel the standard set by Bayes is substantial risk and not readily avoidable risk? Well, it's the substantial risk of serious harm is the Bayes standard. We agree with that. However, there's two parts to that. There's one that addresses the protocol as written, and then there's a second one which Bayes did not address. Remember, Bayes reviewed the procedure in Kentucky where there had been only one execution with no reported errors. They reviewed a protocol after a full trial. We are here on summary judgment. We have not had our opportunity to prove our contentions that the state actors charged with implementing the post-Bayes protocol have a history of deliberate indifference. So to borrow from another area of constitutional law, you're not making a facial challenge here. You're making an as-applied challenge. Exactly. That would be another way of looking at it. And the interesting thing to me, one of the many interesting things about this case, is that your brief frequently says what you just articulated here, which is we didn't have a chance. But the way discovery works today, it's your obligation during that process to proffer evidence of material facts in dispute. And wasn't it incumbent upon you to come forward with some evidence to show that there was a tribal issue of fact during that discovery period? Yeah, it certainly was, and we believe we did. We have established in discovery, for instance, that there was an actual botch of an execution, the Steckel execution. The records maintained by the defendant show he was not administered the anesthetic in the second round prior to the administration of the paralytic and the heart-stopping drugs. That, according to Bayes, is an unconstitutional execution. I thought the record indicated that there was infiltration. Infiltration. In the first administration of the first drug in the anesthetic. Right, requiring them to go to the second arm. And they administered a second round of anesthetic. No, the record does not show that. The record is in dispute on that. In depositions, the executioner indicated he administered the second round of anesthetic. However, the record keeping shows he did not. That's a material dispute of fact. It should not be resolved in summary judgment. That's the quintessential complaint that we have. Show me where the record unequivocally shows that the second drug was not administered. The second round of anesthetic was not administered. I don't have the... I thought the record was... No. And when you look at the paper record, if that's equivocal, and you've got verbal testimony that's undisputed... No, it is disputed. We disputed. We disputed it through the written record, though, right? Well, and I would submit that the written record is a substantial issue of dispute. Well, show us where in the written record it says the second drug was not administered. I'm going to ask my colleagues to pull up that appendix site, but if I could go on. We have multiple instances, historically, of the defendant's indifference. My colleague is telling me that it's at the appendix at 5208 and 5229, indicating that the records maintained, which I would add the protocol required that they be maintained, did not show that that second round of anesthetic was administered. Whoa. Did not show it was administered or showed that it was not administered? Does not... The protocol required at that time for the defendants to keep records of what was administered. Yes. There is no record showing that that drug was administered. All right, so you have an omission there in the record, and then you have verbal testimony that's uncontradicted that says it was administered. Yeah, and I think that that's a material dispute of fact that the district court should have heard testimony on and made a credibility determination. I would submit that the record keeping there could very well trump the testimony of the executioner, and that's a judgment call the district court ought to make. But you just said the record keeping is silent on the question. Record keeping does not say we failed to administer the second round of anesthetic. It does not. You just... Well, no, they didn't write down we did not administer the second round of anesthetic, but it is silent where it should be speaking. It should say second round of anesthetic administered. That was what the protocol required at the time. They failed to do it. And we think that business record, if you will, might very well be more persuasive than the self-serving testimony of the executioner when he's being challenged on a potential Eighth Amendment violation. Mr. Wiseman. Yes, sir. You've identified, as you've indicated here, several instances of noncompliance with the old protocol. Yes. Okay. How do these examples show an objectively intolerable risk of harm with respect to the new protocol? Yes, because they show a history of deliberate indifference. We have, getting back to Steckel, we have a post-Steckel failure to even inquire on the part of the administrators to inquire as to what went wrong.  We've got dosage errors in 40 percent of the executions. They didn't give them the right amount of drugs. We've got indifference shown in a failure to even read the protocol on behalf of the executions. But you have a new protocol now, and they say that they're going to follow it. Well, I know. But when you have a history of demonstrated indifference, the statement by a state actor that we promise we won't do that again, whether that is sufficient to overcome the prior history is a question of fact. That is a question of fact in the 1980s. How are we really going to know if we don't let them try the new protocol? Look, Judge Van Antwerpen, some institutions are able to routinely comply with the Constitution, and some have trouble. You have prison medical systems that administer perfectly fine medical care. You have others that require court intervention. Why is one constitutional and the other not? The answer is that it could be the culture of the institution. We have proven. Virginia seems to be able to do things right. I don't know. Some states do, some don't. I can't tell you why in all 13 executions the defendants in this case failed to follow their protocol. Wouldn't your argument, though, be much stronger if this history of errors had resulted in the failure to administer the anesthetic, which would undoubtedly result in extraordinary pain and suffering, I guess what one might call super-added pain and suffering, unnecessary pain and suffering by the condemned? You've got a history of errors, but I didn't see in the record a history of errors with regard to the most important point, which is the anesthetic. If the condemned is anesthetized, it's hard to say how he's suffering super-added pain. I don't know how else to answer that than by what I said before. The district court made a finding of fact, judging the credibility of a deposition statement over a written record, and that's an issue that has to be subject to cross-examination and evaluation of credibility by the district court. That is a fact finding. You can't do that on summary judgment. And, you know, our view is we have proffered and we can prove that the Steckel execution was a violation of Bayes. It was a botch, as the term is used. But I guess what I'm asking is, is it enough to show botched executions, or do you need to show botched executions that resulted in unnecessary pain? Both are relevant, but certainly the Steckel execution is an execution that would violate Bayes. Bayes said if there's a maladministration of the anesthetic, then that is a violation of the Eighth Amendment. And that's what we believe we have in Steckel, that's what we believe we can prove, and that's what we were denied the right to prove. I mean, we can't have, you know, fact finding without a trial. You say you were denied the right to prove that. Yes. When did you ever ask to be able to ask those questions? We repeatedly. The record, our initial brief, I think says it probably too much. You wanted to ask questions apparently about the state of mind of the people who were going to do it. Oh, the state of mind. We wanted the judge to make credit. Where did you ever ask that? We wanted the district court to make findings with regard to the facts that we said were in dispute, including the Steckel execution. I mean, our pleadings and our filings are replete with requests for trial. At some point, Judge Robinson said, look, I know that's your position. I'm ruling against you. Let's move on. And, you know, obviously we honored that. But we made that request repeatedly. Mr. Wiseman, you're going to have an additional five minutes. Okay, thank you. I was just going to point out. The deliberate indifference that we think is replete in this record goes to a number of or is evidenced by a number of other factors. You know, if you look at the depositions here, you see that confusion was the rule. So the question after Bayes is, can they follow the protocol? We have a situation where they had a protocol, and they didn't follow it. Not only didn't they follow it, they were totally confused. But now they have a new protocol. So what? Respectfully. The fact that they have. So what? The fact that they're having a new protocol is only as good as their historical ability to follow it. Why do you say that? You're trying to use history to prove your case. Okay. But it's a new slate. If I were to sue a police department with a history of beating up people improperly, and I have a history of such actions, and I file a 1983 action for injunctive relief, do I not get an opportunity to prove that despite the passage or adoption of a new policy that says we will no longer improperly beat up people, that I don't get the opportunity to test that at a trial? I don't know about the analogy. I think a better analogy is you're suing a police department that has a history of putting tremendous, inflicting unnecessary pain on people, say, by using batons or handcuffs. And now they've come up with a new protocol where before they put the handcuffs on tightly, they're going to anesthetize the person so that when the cuffs are put on it doesn't hurt anymore. That's certainly, I think, a better analogy than mine. But the cases we've cited, Mayor of Philadelphia being the lead one, we have holdings that a district court cannot make findings about future compliance with constitutional rights, with successor policies and personnel without making a fact finding. And we have not had the opportunity to put a fact finding. Isn't it true, though? I read with interest Justice Ginsburg dissent. Isn't it true, though, that Delaware has imposed a couple of requirements that specifically address the concerns she expressed there? Namely, how hard is it, as I understood her dissent, she's saying, how difficult would it have been for Kentucky to take measures to make sure that this condemned person is truly anesthetized? The eyelash test, the speaking, et cetera. Hasn't Delaware done precisely that? Yes, they've done all that. And if they stick to the protocol, it will be fine. The question here is based on their history of indifference, whether we can, on summary judgment, be confident that they will comply with that protocol without fact finding. And that's as simple as our position is. I would like to address a little bit of the lack of a plan B before I use all my time. I think the issue there is rather plain. You know, it has not been addressed by the district court. It does raise an issue of fact. Well, didn't Bays uphold Kentucky's protocol, and they didn't have to specify what they do if they can't get a Bain? Yes, they certainly did, and that was not at issue. It was not part of the controversy in Bays, and so I don't think this court ought to read too much from Bays endorsing the lack of a plan B. The events in Ohio, I think, if we needed anything more to draw our attention to the problem here, the events in Ohio did so. You're asking us to micromanage this thing, and courts don't do that very well. Don't we have to wait and see what happens in Delaware with this new protocol? Well, with all due respect, Judge Van Antwerp, I think that could be at the cost of someone suffering an unconstitutional execution. We don't get to come back afterwards and say they caused undue pain and suffering, and that's a problem because that person is gone. Obviously, we don't want to see someone's constitution wrecked. No, of course not, and that's why I respond in that way. On the other hand, courts don't do a very good job when we try to become scientists or doctors. Yeah, and you don't have to be. We're just asking for a plan. We want to know how they intend to go about obtaining access. Well, they've given you one. They've given you one. No, they haven't given us a plan B, and they're experts. Haven't they said after a period of time, don't we at least have a representation that they were going to do something if they can't get a vein? Well, yes, they said they would, quote, re-evaluate the condemned and make decisions, quote, unquote. That's their plan, and I would submit that with defendants with this history of repeated errors and indifference, that that is not a satisfactory representation. Ask them, what is their plan going to be? We haven't heard it yet. Are they going to come back in an hour? Are they going to come back in another day, in a week, in a month? Are they going to try the same process over again? You know, are they going to just simply try to establish? They're the people in charge of executing the condemned man. We aren't. Yes, but Nelson v. Campbell, for example, the cut-down case, found a Section 1983. They don't do cut-downs. No, I understand that, but they also found a cause of action in that case for the failure to have a written protocol. All right? And if you've gotten a person who, like the plaintiff in Nelson, for whom venous access cannot be peripherally obtained, then we have a 1983 constitutional right to know what they intend to do. It's as simple as that. We're not asking you to micromanage. We're simply asking them to tell us what they're going to do. If we've got a problem. They have told you, but you're saying, and I understand why you're saying it, but you're saying don't trust them. Don't take their word for it because the history says they shouldn't be. They can't be trusted. I'd love to trust them, but what is the plan? The irony in saying don't trust them is the new protocol and the amendments they've made, they've given you at least partially what you've requested. Yes. No, that's certainly true. Which would seem to indicate that a newfound level of trust is warranted, regardless of what's happened in the past. I don't know that we have to get to subjective levels of trust. I would point out that that adoption was made on the eve of trial. However, I'm not asking for micromanagement. I'm not asking for evaluation of a Plan B. I'm asking for a Plan B other than we will reevaluate. We just don't know what that means. Are they going to bring in someone to perform a procedure that they're not qualified to do? Are they going to use proper anesthetic work? What are they going to do? Mr. Wiseman, we'll have you back on rebuttal. I'm sorry, Your Honor, I went long. Thank you. That's okay. Mr. Niedzielski? Yes, Your Honor. Mark Niedzielski, Your Honor, for the defendants below. May it please the Court. What's the problem in Delaware? Virginia has done all these executions. Your Honor, we did 13 of them with no problem. No problem? We just listened. I know. I was surprised because everybody else that watched the Steckel execution reported it took longer, but they didn't report that Steckel was in any pain or any discomfort whatsoever. You can't keep records? That, Your Honor, is a problem. Well, then what is the problem? Records was the problem. The person that kept the records, which he's talking about, was not the person that was administering the drugs. But shouldn't Delaware, you know, this isn't a transaction at Walmart. I mean, shouldn't Delaware make darn sure that its record-keeping crosses every T and dots every I and absolutely with as near to 100 percent certainty as allowed in the human enterprise make sure that these condemned don't suffer unnecessary, super-added pain? Absolutely, and that's what the new protocol does. It sets forth very detailed records that happen. He says we shouldn't believe you. What do you say to that? Well, I don't know what to say to that, Your Honor. We're talking about a new protocol. We're talking about different people, different personnel. He says he wants more fact-finding. For what? To prove that we shouldn't believe you. Well, Your Honor, he did a lot of discovery. We did a lot of depositions. We went to Boston. We went to Philadelphia. We deposed lots of people. He got an opportunity in responding to our motion for summary judgment to append and to point to the court all parts of the record, which he did. How about when you can't get a vein? Can you tell us today what's going to happen? The protocol provides, Your Honor, that if they can't get venous access to within the first hour, they will call the governor and will ask for a stay. Now, in the Delaware law, the penalty... What if the governor says no? Well, Your Honor, under Delaware law, the execution has to be conducted between midnight and 3 in the morning, and that's it. And the Plan B argument is an interesting argument, but the problem is that you'd have to figure out why you couldn't get access on the inmate. And you wouldn't know that until some time afterwards. I mean, it could be something as simple as it may be that that particular condemned was taking certain medications which caused his very low blood pressure, very hard to find his veins. Mr. Niedzielski, go to another area, for instance. You know, this Bays case, Bays' decision, the justices were all over the lot, you know, three-person plurality. Yes, Your Honor. Now, did the court actually articulate a standard that we're bound to follow? Your Honor, I think that seven out of the nine justices affirmed the judgment of the Kentucky Supreme Court, which was their protocol, did not violate the Eighth Amendment. Aren't we supposed to look for the narrowest ground? Your Honor, that's the narrowest ground. Wasn't the narrowest ground the affirmance of the judgment? Yes, Your Honor, that's the narrowest ground. Isn't the narrowest ground under Marx and Planned Parenthood from this court the substantial risk standard because you have three justices adopting that standard and you have other justices adopting the readily avoidable risk, which would obviously include substantial risk? So if we actually apply Marx to this case, wouldn't you really wind up with the substantial risk standard as the other circuits do? I believe so, Your Honor. And the interesting thing is the Delaware Protocol also addresses the issue brought out in the dissent, which was the lack of the consciousness check. So actually the Delaware Protocol meets the Kentucky Protocol. By the way, the other circuits just assumed it was the substantial risk standard. They didn't explain why. They just kind of jumped over that. Your Honor, it was a very exciting opinion from the Supreme Court. Yeah, well. The good thing is we only have a three-justice panel. You can only get three opinions. That's happened. Yes, Your Honor. You know, we privately said to a former member of this court who's now in Washington, how is it serving on the highest court in the land? And he said, well, Frank, the good news is we don't have to take every case. The bad news is when we do take a case, it's always in banks. What can I tell you? Look, it causes me some concern, the problems you've had, quite frankly. I mean, the gentleman has made some arguments here. This is a very serious proceeding. Yes, Your Honor. A man or woman could suffer pain. I don't think you dispute that. When the second injection paralyzes them, it would be a horrible way to die. That's my understanding, yes, Your Honor. And it's extremely important. And you know this is going to be scrutinized. Yes, Your Honor. I can't for the life of me wonder. Aren't these people under the control of the warden or somebody who says, look, do your job? Your Honor, the depositions and the evidence from the people that participated from the Department of Corrections all testified that, in fact, there was no evidence of any kind of suffering at all, period. No, but I'm not sure you've addressed the question. That goes to whether the pain has been suffered in the past. That doesn't explain away or justify errors in record-keeping and documentation, et cetera, et cetera. Well, Your Honor, the only thing I can say is that this protocol was intended to correct some of those things, specifically with record-keeping. It was also intended to make it very transparent to the extent possible of the procedure and how it would be carried out. And it's very clear from the protocol that the intent of the protocol is to carry out as humane an execution as possible. We upped the dosage of thiopentol from the prior protocols that used to be 2 grams. We increased it to 3 grams. That's a massive dose. That's 12 times the normal amount that would be used in surgery. And then there's a saline flush, the second drug, a saline flush, and the third drug, and then a saline flush. In addition, we've added EKG as part of the protocol. We also have a crash cart now. And we have more practices than they used to have. And we've gone way over there. We've installed a pan-tilt camera, a very high-resolution pan-tilt camera in the execution chamber, just so the people that are administering the chemicals, the drugs, can have an instant view of the face or the infusion sites of the condemned. So I think we've gone and spent a great deal of money. Are these people EMTs? What kind of training do they have? They're paramedics, which is advanced EMTs. Does it make a difference that, as I understand it from the record, the American Medical Association prohibits its professionals from engaging in this sort of conduct? Has that hampered your ability to conduct humane executions? How does that play in? Well, Your Honor, as you know, yes, that's a problem. Because, you know, if the AMA has an ethical prohibition against it, it can become a problem for us because, and you can see that, that's across the country. Doctors don't want to get involved. Hasn't Oregon passed an assisted suicide law? Very interesting, isn't it, Your Honor? I mean, does the AMA say you're allowed to do an assisted suicide in Oregon but you can't help do a humane execution in Delaware? Is that where we are? Your Honor, and the Dutch go further than that. Are all the doctors in the Netherlands unethical? Well, Your Honor, I don't know. It's a very sliding scale. I mean, they don't permit capital punishment in Holland, but apparently your doctor can involuntarily euthanize you. And, by the way, with two of the same medications that we use. Instead of getting into Holland and what the Netherlands does, how about talking about Ohio for a moment? Your Honor, I don't know why. Why isn't there something to learn from Ohio's experience? And it seems like the recent execution in Ohio just last week or the week before seems like a pretty good plan B. Why shouldn't the states move to that? Well, Your Honor, in Ohio my understanding was they couldn't get venous access. So the ball game never got started. It got called because of rain. And that was the problem in Ohio. I don't know why they couldn't get access in Ohio. I don't understand it. Delaware's never had a problem getting venous access. Isn't it true you could probably kill 99% of the people, excuse me, execute 99% of the people, just by giving a massive overdose in the first drug? That's my understanding from the evidence. Yeah, five grams of thiopental would probably kill 99%. But it would take longer. It could take a very long period of time. It might be convulsive movements. There may be a lot of unpleasantness involved in it as well. So really for aesthetic reasons we're running the risk of all this? No, I don't think it's for aesthetic reasons, Your Honor. I think it's for reasons of you don't want to have an adverse influence on the people that have to perform the execution. I think that's an important consideration. It's also important to understand that in the witness room is the family of the condemned and the family of the victim. So I think, and also, as I said, there's a chance that you won't die. With the three-drug protocol, there's no question that you will be dead at the end of the protocol. There's no question. Is anybody doing the single-shot protocol at this point? I understand Ohio tried it for the first time. But, I mean, beyond that, we haven't got any history. It's only Ohio, yes, Your Honor. All right. Mr. Niedzelski, did you have anything else to add? Just very briefly on the stay. That was our basis for our cross-appeal. And that simply was there was no reasons articulated by the district court for the stay. Since the procedure we had complied with with Bayes, it seems there should have been no stay entered. And so we clearly want to stay is going to follow whichever way we decide this case, is it not? As a practical matter, yes, Your Honor. It's pretty clear what the reason for the court's decision was on the stay, isn't it? I don't think it is, Your Honor. Didn't she leave on the possibility she was wrong? I mean, if she was wrong, there wasn't much harm in entering the stay. There was tremendous harm in not entering the stay had she been wrong. And if she was correct and gets affirmed, then no harm, no foul, right? It seemed like a no-lose proposition for the trial judge to enter the stay, did it not? But I think we still have to go through the trial court still has to give the reasons for why they're entering the stay. That's your position? Yes, Your Honor. Should we say that? Well, Your Honor, if you affirm the trial court, you don't have to say anything else, I don't think. Wouldn't it be important for the future? I think if you, in Atlanta, Ohio, the district court, the judge district court, did deny the stay to that guy Beros, who he just executed with, on the grounds, the same grounds, on the grounds of the base decision. So there's no basis for a stay. Okay. I don't think it would be presumptuous of me to say that if we do let you go ahead, if there's any message that you bring back to the people is it's time to get your act together, okay? Thank you, Your Honor. Mr. Wiseman. Thank you, Your Honor. Let me start by first expressing my regret for my slight outburst there. I guess I get a little frustrated. Which outburst? Where I said somewhat, that was not a helpful comment. And I guess I'm just feeling frustrated because. It's a serious matter. Yeah, and I keep hearing about, you know, the new protocol. And I guess, you know, just fundamentally my view is, what good is the new protocol if you failed in all prior attempts to follow all other protocols? And I just regret losing that. You're forgiven. You're trying to do your best. I appreciate that. Thank you, Your Honor. What's left for this court to do? And Judge Van Antwerp and I hope that we aren't going to let them go forward quite so quickly. There have been hearings post-base in quite a few cases. There were hearings in Buros in Ohio just a week ago. Mr. Broom had a hearing post-base in Ohio. There have been hearings post-base in Washington State, in California. And, you know, we've got – Bays doesn't – Mr. Weisman, one thing that always serves the defense well in these cases is delay. Now, you know that. Oh, oh, oh. You know, I'm not accusing you of anything, but I'm just saying as a practical matter, in all these cases delay always serves. Sir, this case – And if I was in your position, I'd be doing the same thing. But that's not what we're doing, Your Honor, most respectfully. This case could have been over months, if not years ago, if the defendants had adopted the one-drug protocol. No, there's a new challenge to that that's out there already, and you know that. Oh, no. We've taken a position repeatedly that the adoption of the one-drug protocol, we go away. There are other elements in the United States that are challenging the one-drug protocol. I've seen it. You know it. Yeah, but we in this litigation have taken a position that the one-drug protocol – At this point, yes. You know it's going to be challenged. We're representing the class. We're bound by that representation. I know that. But you know if they switch to one-drug protocol tomorrow, that would be challenged. No, it wouldn't be challenged by us. I can tell you that. And, you know, we have moved with great speed in this litigation. We've asked for one continuance of one discovery deadline. Otherwise, we've been moving as quickly as we could at the court's direction. But let me make a couple of other points. Mr. Nijelski, respectfully, did not answer the Plan B question. He said the execution is good from midnight until 3, and then what? Do they come back at 4 o'clock? Do they come back the next day? What's the plan? We still haven't heard that. That's a problem. Now, I suppose if we wait to see what they're planning to do and we come back before you, Mr. Nijelski will accuse us of having delayed by not bringing it up earlier. We have a constitutional right to know, given their record, what their plan is. Steckel showed no pain because he was paralyzed. That's the whole problem with this. There's conscious paralysis with the administration of the second drug. So after the first drug is mal-administered, the person is paralyzed by the pan-uranium bromide, and they simply aren't able to articulate that they're in pain. And I would ask the court to look at it. We'll never know, right? That's the point. Then you're being asked to prove something that's near impossible to prove. I think we could conceivably prove it, but I think the absence of seeing him screaming out in pain is simply because the second drug is preventing that. The AMA and the doctor question, Ohio doesn't use doctors, and they seem to have come up with both the one-drug protocol and a plan B. Is the desire to restrain convulsive behavior in the final stages, is that a legitimate concern? I'm sorry, convulsive? Moving around. The Supreme Court in days endorsed the use of the pan-uranium. They did. And so that is what it is. I mean, personally, I don't think it's an appropriate thing to use, but that's not, unfortunately, the rule. I mean, it is designed for that purpose. If I could just make the final point, in his deposition, Warden Carroll, who was then responsible for carrying out the execution, wrote the protocol and, in fact, presided over the Steckel execution, thought, in fact, that the medical doctor played a prominent role in the execution process. Of course, when we deposed the medical doctor, he said, oh, I don't have anything to do with this. I'm just here to pronounce death. So it didn't seem to stop the warden then from employing a medical doctor who he thought was going to do stuff, substantive duties during the execution. It also speaks to the question of the confusion going on. Here you have the person presiding over the execution. If there's a problem, thinks the medical doctor is going to fix it, and the medical doctor says it's the last thing on earth I'd ever do. Another example of their indifference. All right. I appreciate that. I think we understand your position, and we thank both counsel for their argument, and we will take the matter under advisement.